Here you, here you, here you, Ms. Honorable California, Second Judicial District, is now back in session in pursuit of adjournment. The Honorable Susan F. Hutchinson is up. Please be seated. Ms. McCormick, this is a case on Docket 2-15-0671. Bridget Kenti, Administrator of the Home of Hilaria J. Ormond, deceased. The plaintiff will meet in the house of charges of all defendants' appellants. The argument on behalf of the defendants' appellants is that he is to brown. The argument on behalf of the plaintiff's family is that he is to red. All right, thank you both for giving us the extra time. We've had a long morning and we had to finish those cases before we could open our heads to this one. So we do appreciate your indulgence of us. All right, Ms. Graham, whenever you're ready, you may proceed. Thank you. Good afternoon, your honors. Again, Karen DeGrant on behalf of the defendants' appellants, Anesthesia Associates, may it please the court, counsel. The defendant comes before the court seeking reversal of a judgment in a medical malpractice case. We've raised a number of arguments and seek relief in the form of a JMOB, new trial, or alternatively, a remittitor. I hope to address the points that I believe are the primary points that will be of interest to the court. And ask the court to please consider the briefs on any points that we don't reach during argument today. And I'll begin with race ipsa, a question of law for the court. Our position is that the doctrine had no place in this case involving an alleged failure to diagnose. Yet the trial court denied the defendant's motions in limine and permitted the plaintiff to proceed with this theory. The case law, I'll submit candidly, is a little challenging as far as making a neat characterization. But the guiding principle, we believe, plainly show that this is not a race ipsa case. The Supreme Court's Heastie decision explains the parameters. And we've quoted what I think is a very salient point from the Heastie case in our brief. It's very definite on the point that there is no reason to employ this inference of negligence where the mechanism of the injury is known as it was here. And the quote that appears in our brief. What is the mechanism of the injury? The mechanism of the injury is the harmonic scample that is used during the surgery to cut the vessels and also to seal the vessels. And as Dr. Mayfair testified at trial, clearly was the basis for the internal bleeding that occurred shortly after the surgery. But when there was a conclusion of the surgery and Mrs. Orman was taken to PACU, there was, before she got there, they were sure nothing was bleeding and everything was fine as she moved from point A to point B. So how can the scalpel be the mechanism of the injury? The mechanism of the injury, Your Honor, is what puts the injury in place, what puts it in motion. So, and I think that that's what distinguishes this case, frankly, from the typical case where there might be a theory raised on a consecutive control type of theory. And in that type of situation, perhaps the surgeon or several actors in the surgical arena and then perhaps in the recovery room or some other post-surgical care might be involved and nobody knows what happened. Or in this instance, and maybe this is the most common, where something goes wrong during the surgery, but nobody knows who did it or what it was. And the distinguishing case, possibly the most distinguishing case or aspect of those cases from this case, is that there was no allegation of negligence by Dr. Mayfair or anyone else during the surgery, everything is concentrated on the recovery room care. And that's what sets this case apart from the rest of the cases. So how do we know that on the way from the surgical surgery room to the intensive care recovery unit that she wasn't jostled? Or how do we know that she didn't move or somebody hit her area by mistake? Or even a nurse walking up to her bed moved it just enough so that this artery reblood? Well, I think that would be speculation that there's no basis for reaching on the record in this case, Your Honor. And that's one of the points that plaintiff made in the brief that was filed in this court, was that, gee, we don't know if Dr. Nassim or somebody in the recovery room perhaps dropped this woman. But the plaintiff took the position in the brief, and all of the plaintiff's witnesses testified at trial that the bleeding was occurring during the entire time that the patient was in the recovery room. And so there was nothing to dispute Dr. Mayfair's account of what he believed happened. And the other part of this that I think puts that theory into the impermissible speculation category is that Dr. Saker, the plaintiff's hematologist, testified that, in his opinion, she'd lost 30% of her blood volume by 4.15 PM. So I don't think there's any basis to reach that. It's clear that had she not had the surgery, this particular injury was not likely to occur. But the surgery, according to everybody, was successful. Less than, what, a tablespoon of blood lost or something like that? So how, I'm still having problems with how the scalpel could be the mechanism. Well, because that's what Dr. Mayfair said. Because that's what the testimony was, and that's what the record shows. And again, I think we have to contrast this case with the race of the cases, where there is a question as to what happened during the surgery. The Adams case, for example. What happened during the abortion? What was the cause of this child's injury and death? And there was competing testimony in that situation. And in this situation, there isn't any competing testimony. So I- Is there any authority for finding that the care in the unit, the PECU, whatever you call it, for finding that that was the instrumentality? I don't see any case that supports that notion. And it's our position that if the court affirms that theory of negligence in this case, that what we'll have here is the potential for any hospital situation, it doesn't have to involve a surgery. It can be any hospital situation where there is an allegation of a failure or a delay to diagnose. And because even if the court looks at the instruction, which is at page 1834 of the common law record, and was read into the record, or read to the jury at 3900 of the report of proceedings. Just reading that formulation shows that what the court has, the question the court asks is a very important one. Because the instrumentality, and that's one of the blanks that has to be filled in for the pattern instruction, is identified as the recovery room or the recovery room care. How can that be? An instrumentality, and not sweep up such a broad array of hospital care. I just, I don't think- Well, it did, in fact, sweep up a fair amount. We have a failure to properly communicate on behalf of possibly one of the nurses. And that leads to the hospital, who are, of course, no longer in this case. But there's a protocol there that puts Dr. Nason in charge of that facility. That room, that space. And they, apparently the jury thought that he did not properly manage that space. But, I'm sorry, Your Honor. Go ahead. And I think that that's a fair characterization, except that that doesn't lead to support a race-its-a theory in this particular case. Race-its-a is a doctrine that was created when it can't be determined, because of the nature of the circumstances, what the mechanism of the injury was or what the actors did. And in this case, we don't have that problem. The other part of the, I'm sorry, Your Honor, you look like you want to ask me a question. Well, I was going to say that the person who wielded the scalpel is no longer in charge. She can't do anything. It's Dr. Nason who has to do something within that space. I agree in the recovery room, and also the plaintiff had alleged that Dr. Mayfair had to do something in the recovery room. But what is conspicuously absent from this record is any allegation that anything had, anything negligent had occurred in putting this in motion. And that's when the race-its-a inference becomes appropriate, potentially. And in this situation, the other part of this piece that demonstrates that it was not appropriate is the policy reasons for employing race-its-a are not necessary. I mean, this is not one of these situations, and this is recognized in the case law, where the defendants circle their wagons, and nobody knows who left the sponge, or whatever the instrumentality of injury is. That's not what happened here. In fact, the plaintiff- The surgeon does sort of throw up his hands and say, not me. Right, he does, but what he says is, it's not a situation where there is a reluctance of the medical personnel who knew what happened, who knew what was going on, to come forward and testify. I mean, Dr. Mayfair, the court knows from the plaintiff's motion that was, in large part, denied by the trial court, appears at page 396 of the record. And the plaintiff wanted to present a series of video clips to the jury that the plaintiff felt was an appropriate way to present testimony. And the trial judge said, no, we're not going to do that, for the most part. And attached to that motion, at page 437 of the record, is Dr. Mayfair's discovery deposition, where he was more than willing to testify to his, frankly, criticisms of the care that were rendered by other personnel. So this wasn't a situation where we can't figure out what happened, we don't know who did what, we don't know what the mechanism of injury is. It's fair and appropriate that if the plaintiff can meet these other hurdles, that we should permit the race ipsa question to be submitted to the jury. And frankly, I think if nothing else demonstrates the difficulty here, it was in the instructions conference, the back and forth, trying to come up with some way to describe this race ipsa theory on this record. Well, speaking of instructions, were there any special interrogatories in this particular case? There was no special interrogatory that pertained to race ipsa. There was a special interrogatory in the Silver Axman cause. And why wasn't there one on race ipsa? Your Honor, frankly, there was some thought given to that. And the difficulty is coming up with a special interrogatory where you're talking about basically a negligence theory. You're basically comparing apples to apples. It's not a separate theory of recovery. It's just a way to get over the evidentiary hump. So there was not a way to test the verdict with a special interrogatory. Because it's not for, you know, a distinction would be a situation where I allege that Dr. Smith was negligent because he didn't, you know, repair my knee properly. And then he also didn't take care of me afterwards. It's not that. It's not those two separate things. It's just one way, two ways to prove the same negligence. So it just didn't work. What effect does it have if you're saying that the instrumentality for the race ipsa was the harmonic scalpel? What effect does it have where the instrumentality is not the basis for the negligence claim? Because that really would be the situation here, right? The negligence claim is there wasn't proper care for her in the PACU. So really, if the instrumentality is totally separate and apart from the negligence claim, what effect does that have? That tells me that this is not a race ipsa case, Your Honor. You want to elaborate a little bit more? Well, sure. I certainly, and I'm not being flip. But it shows that we're trying to push a square peg into a round hole here. And, you know, again, you know, to the extent that we want to change the facts a little bit or we want to look at some of these cases, there is no case that I've read that shows a post-surgical recovery room situation as being a proper subject of introducing the race ipsa locator inference. Typically, wouldn't the instrumentality be part of the claim of negligence? Right. That's correct. So it's either the situation where you have all the medical personnel who are involved in the surgery, for example, who dropped the sponge, you know, whose fault was it that that artery got clipped, what have you? Nobody knows. Okay. Well, that's a race ipsa situation. Or it happened then, but nobody's talking. Or maybe, you know, there is still race ipsa has been expanded a little bit in some instances to encompass a consecutive care situation. Well, but I guess I'm going back to probably some of my earlier questions. She was fine, by all accounts, when she left surgery. Something happened that was not identified in the PACU. So how do we establish what happened in the PACU? Because we just don't know. I think, again, I have to point the court to Dr. Mayfair's testimony. He gave a very detailed explanation of what he believed happened, and there wasn't a person. Well, that's what he believed happened. Well, he, I'm sorry, go ahead. We don't, you know, he didn't, he wasn't watching every moment. And he's saying, this is rare. What happened here is pretty rare. So we don't have a lot of reported cases on this type of an issue either. That's correct. But also, Judge, I point to the testimony, and so it's an undisputed point. I point also to the testimony of plaintiff's experts, particularly Dr. Sankar, the hematologist. She's, you know, she's bleeding, and she's lost 30% of her blood volume by 4-15. To Dr. Bell, her bleeding started shortly after the surgery, somewhere between 350 and 405. That's all before any negligence that is identified on behalf, or on the part of Dr. Nassim, long before. The first point in time where he allegedly was negligent was 4-55. So again, I just feel that this is not an appropriate inference. And I will, I know my time is up, but if, may I briefly address a few other points? Yes. Even if the court has doubts about possibly racepsa being appropriate, there are other points that demonstrate that this case, the record has error that requires a new trial. The whole, the racepsa evidence bled into this testimony by each and every one of the plaintiff's experts about this team standard of care, which is nonexistent in Illinois. This team negligence concept permeated, it wasn't just limited to this racepsa circumstantial negligence theory, but that also permeated the specific acts of negligence theory. Did a doctor ever use the word racepsa loquitur in any testimony? Any testimony of the physician? In this case. I'm not, no, I don't think that that specific term was used. I guess I'm confused about what this bleeding into. Well, because what the plaintiff did was to question the experts on the element of, would this type of injury ordinarily happen in the absence of negligence? And then, so that was sort of carried over with the plaintiff into having Dr. Bell and Dr. Helgeson, who led the charge, of course he's the only anesthesiologist who testified against our client, to testify to this team standard of care. If somebody on the team would have stepped up, then perhaps Ms. Ormond would have been diagnosed in a more timely fashion. That concept. And there's no, there's no, the PACU wasn't a defendant, the PACU team wasn't a defendant. There were individual defendants who had, and for each individual defendant, there was a specific standard of care that applied. Well then, let's just talk about Dr. Nassim. He comes in at 455, and he's tried two interventions up to that point. They've, one worked temporarily, the other one probably didn't do much of anything. And he's still reluctant, or apparently reluctant, to get a consultation. What's the reluctance? Well, I think, first of all, I have to respectfully disagree with the court calling it a reluctance. I mean, he's got a short window of time. And he's trying to determine whether these, the five possible causes in his differential are the cause of his inability or her inability to get that blood pressure going back up to where it should be. And the plaintiff's experts testified, or at least Dr. Helgeson testified, that there was nothing wrong or inappropriate about his considering those five differential causes. And they thought, of course, that he should have reached the conclusion of internal bleeding faster. But I don't think there was a reluctance. I mean, we're talking about a short period of time, and by 551, they're on the phone to Dr. Goldman. And- Well, that's an hour. 455 to 551, that's an hour. That's reluctance to me. How is that not reluctance? Because they were trying to determine other- They did one other intervention. I think that's when they gave, was that the epinephrine? Or some other intervention after that? But they didn't order any testing. They didn't order any testing. There were a series of interventions that- Before 455, there were two. The third one came after 455. Right. But there was nothing ordered in terms of tests, CDC, nothing, no x-rays, no nothing. Just, okay, let's try this. Well, CDC and the BMP and the x-ray were ordered at 551. But he's, well, that's an hour from 455. He's back in the PACU, and at 509, he's at bedside, and they are trying additional interventions in that period of time, Your Honor. Okay, so- And just also, Your Honor, to point to some other independent basis for a new trial, which I think are very significant, and this was, these were not, this is, this is not sort of a stray comment here and there. This is not an isolated comment, but it was the scene of trying to establish in the eyes of the jury that Dr. Nassim was a bad doctor who wasn't paying attention to his patients and was unqualified to handle this situation. And this came out in the cross-examination of Dr. Nassim, cross-examination of Nurse Schweitzer, and there were some objections that were sustained. There were some that were not sustained. The trial judge inaccurately recalled that when he was ruling on the post-trial motion. And what did that tell the jury? That told the jury that this doctor was too young and too inexperienced to handle the situation. And so, certainly, that was inappropriate, and the concept of wide latitude of cross-examination does not excuse that. But this wide latitude concept that the plaintiff advocates in this court is denied to anesthesia associates when attempting to cross-examine Dr. Helgeson on his qualifications. So, this was a whipsaw effect. Certainly, we're not advocating that this court reverse for a new trial based solely on the denial of that cross-examination, but it's in conjunction with the cross-examination of Nurse Schweitzer and also of Dr. Nassim that sold this idea to the jury on points that had nothing to do with any deviation from the standard of care, or in some instances, not even anything to do with the care of this patient. And then, of course, we get to, and particularly with respect to Dr. Helgeson who said, who gave the dramatic testimony that the diagnosis was so crystal clear, and the patient was all but screaming, I'm bleeding, I'm bleeding. We needed everything we could to cross-examine that physician, that witness who was leading the charge against our client and were denied that opportunity. The closing argument also, if there was a chance of a fair trial by the time of the closings, which I frankly doubt based on everything that I've argued up until now, it was negated by the plaintiff's slide presentation, among other inappropriate comments that were made during the closing argument. And it's important to consider the context. First, the slide goes up about rules broken, objection sustained, and then, I don't know if it was the next slide, but within a short period of time, the slide goes up, this is your call to action. That was recognized by the trial judge as inappropriate and as being akin to the, send a message. You send a message with your verdict. And that- Did that come down before, I mean, just as fast as it went up, it came down? Well, I disagree with that characterization, Your Honor. It was up there long enough, and if the court can picture this, it's on the big screen, okay? And it's in front, it's right in front of the jury, and defense counsel, and rightly so, to preserve the record, reads it, this is your call to action, objection, Your Honor. So it's in front of the jury for enough time for him to read it, for him to say it, for the jury to see it. That's probably longer, I'm sure it's longer than it would have taken if plaintiff's counsel had stood up, forget about a PowerPoint presentation, and said, this is your call to action. But nobody would say that that's appropriate. The fact that it's on a slide doesn't immunize it from being improper argument. If anything, I think, emphasized it. The judge sustained the objection? The judge sustained the objection. Did he instruct the jury as to, did he give them any admonishment? I don't believe there was an admonishment, Your Honor. But the objection was sustained. But wasn't the damage done? You know, the jury's being told to punish. The jury's being told to right wrongs. And that's not what a civil jury trial is about, Your Honor. That was a rally cry. And it's our position that that, plus these other inappropriate slides, including the slide that was put up, that contained information that plaintiff herself had asked the judge to bar in a motion to eliminate. I think that what we have here was a scripted, premeditated attempt to incite the jury. So what I think we have here was an excessive verdict that was relied on this inappropriate trial of this inappropriate evidence. And we ask the court, of course, we rest on our brief for the remaining points. Thank you very much. Mr. Rappaport. Thank you, Your Honor. Your Honors, good afternoon. Mr. Brown. If it pleases the court, I think I'd like to start just by trying to place the case in context. Which is, we have a clear case of specific acts of negligence proven. There has been no challenge to any one of the allegations that were instructed on. We proved a causation associated with it, and I didn't hear a word about that. So what we have- Well, there is something in the brief. Right, there is. I'm just saying I didn't verbally hear a word about that and the things that were being emphasized. And I'm happy to talk about this and any other issue, obviously, in detail. But so, what is the context of the first issue and the one that took up most of the time in the discussion that we have had here today? The context is, should the case have been submitted on alternative theories of specific acts of negligence and res ipsa loquitur, which is a thing that is permitted. We have a number of Illinois Supreme Court cases that make quite clear that it's appropriate to pursue alternative theories. It's interesting when we get to the question of the legal standard for review of the res ipsa issue, because it's really a series of issues. A trial judge has a duty by statute to make a call about whether res ipsa is in or not in the case. And I want to talk a little bit more about the statute, because it very explicitly tells the trial court what to look for in making that call. Well, the trial court did make that call. He would seem to be reluctant to make that call, but he seems to have made it. Yes, okay, and so clearly, you've all read the record carefully. And Judge Brady, who did a two-week trial here, and who I believe is a fair-minded, down-the-middle umpire, worked through all issues in this case and tried to get them right. And I believe he did ultimately get them right. But there's no question that he thought a good deal about the res ipsa issue and then decided that it belonged in the case. And if we look at the statute, which is cited in our brief, I have copies here in case anybody wants to. It makes very clear that the link in to this mechanism is tied to the fault. The statute itself, if I can take a moment, I'll just pull it out and share that language. Forgive me, I don't want to go too far from the microphone here. So, the statute that I refer to is 735 ILCS 5211.13. I don't know if anyone would want a copy passed up, but the bottom line is it says, In all cases of alleged medical or dental malpractice where the plaintiff relies upon the doctrine of res ipsa loquitur, the court shall determine whether the doctrine applies. In making that determination, the court shall rely upon either the common knowledge of layman, if it determines that to be adequate, or upon expert medical testimony that the medical result complained of would not have ordinarily occurred in the absence of negligence on the part of the defendant. Proof of an unusual, unexpected, or untoward medical result, which ordinarily does not occur in the absence of negligence, will suffice in the application of the doctrine. So what we're talking about here is a 57 year old woman who had a hiatal hernia repair, where she lost a tiny amount of blood, nothing was cut that shouldn't have been cut during the surgery. The operation went perfectly fine, and she bled to death over three hours in the recovery room, while the nurse and the doctor both had the job to monitor her. And this is not a stealth bleed to death. One of the primary issues at trial were the statements by the nurse and the doctor to try to say she didn't look so bad. But we put in our appendix, please exhibit 16 and 17, to show you just how bad her body was broadcasting that she was in trouble. Her blood pressure was bad, she was lethargic for the entire time. It took a different nurse than the one who had been working the patient to sort of walk in there at the end and say, what is going on here? Why don't you get a surgeon? She did have a conversation with the surgeon when he stopped by just before he left, I assume for the day, to go on with the rest of his day, and they actually spoke. Sure. She said a few words. She didn't say, I'm in a lot of pain, I don't know what's happening, did she? Well, what she said, what she didn't say, how lethargic, these are all things that were characterized by different people at different moments. But I've never been able to offer any evidence on it, because unfortunately, Mrs. Orman didn't survive. What we do know is she was in Trent Bellenburg, and in plain English, for anybody that may not know what that means, we tilt the person so that their head is really low, and we're going to get the blood down to their head. I mean, this is going on the entire time. So the point I think I'm trying to make is the recovery room is to recover. The normal drill would be to be out of there on a surgery like this and being sent home an hour or two after it's over. If you have a surgical complication, then you call in a surgeon. That's centrally important, and that didn't occur here in a timely fashion. And answering one question that came up about race, it says, well, of course there's authority. It's the Adams case. It involved a death from respiratory arrest in the recovery room of a poor 13-year-old girl after she had had, I think, an abortion procedure. There was talk about was too much anesthesia used or not. There was a big debate about that. But with respect to what happened in the recovery room, which was a race-IPSA part of the case, that case, the charges in that case didn't let it go to the jury, and I think was reversed on that point. What would you say the instrumentality was in Adams? Well, in Adams, it was the failure to monitor respiratory status in the recovery room. That's what I view. Now, to be perfectly honest, Justice Spence, no one can know for sure what a jury would have thought of it. And I think experts might have debated about whether that's adequate monitoring, not adequate monitoring, what have you. But I think that the reason that a race-IPSA was appropriate in that case, at least in part, if not in whole, is because there was inadequate monitoring and somebody had a respiratory arrest in the recovery room, another form of not recovering. Whereas the recovery room, people in charge of it are supposed to help people if they can be helped. And they start to either not breathe or to bleed to death. Wasn't the instrumentality the anesthesia, the amount of the anesthesia that was used? Well, there was an allegation in the case of specific acts of negligence that there was too much anesthesia used. But the jury rejected that apparently, because if I remember this right, it went up because the race-IPSA allegation was not put in. So I can concede that there was some evidence in the record by some people that the anesthesia may have been too much, but I guarantee you that there were defense experts that said it wasn't. I can't imagine that that was a concrete fact that any of us can rely on. But the court describes what happened in the recovery room. And more importantly, perhaps, is the statute itself. Every element of that statute is met in this case. And the other point is that the issue wasn't preserved. And you don't need to look further than the Heastie case to see an example of a jury that returned a verdict that let the court of review know whether they were going with specific acts or race-IPSA or both. In that case, I think the jury answered yes to both. But we were not offered, I don't know what discussion they were talking about, may have been on the defense team, but there was no point where anybody proposed a way to get the jury to tell us on what basis they were making their decision. So what do we know here? We know that because Dr. Mifare was not guilty, we know that race-IPSA was rejected and so were specific acts. With respect to the other two defendants, we can never know that. And that brings into play this other statute, 735 LCS 521201, which talks about, and I think is an important principle here, that without regard to the merits of the race-IPSA issue, there was substantial evidence of specific acts of negligence that caused Mrs. Orman's death and conscious pain and suffering before death, and we'd have no idea what effect the race-IPSA issue had. But most importantly, race-IPSA belonged in the case. Now I want to, is there a question? I see one coming. I wanted to ask, we get to 455, which apparently is a critical time for everyone. Dr. Nassim gets back in physically, and I'm not saying he should have been there before. Doctors have to be often in two to three places at once. But he's back there, he has five things, and that's what I call them, five factors he's looking at. The bottom is an internal bleed, the top has to do with some medication that she's taken, and the anesthesia, and the surgery, and things of that nature. But an hour goes by before he acts apparently on the one at the bottom, the internal bleed. What, why, and I think, what do the doctors say about what he should have been doing then? Just doing one at a time on a checklist, or what was he- No, no, no, so of course there's conflicting testimony. There were anesthesiology standard of care witnesses on both sides of the question, and what they say should have been done may not be a complete match. But for our purposes, I think the evidence has to be taken in the light most favorable to the plaintiff in these circumstances. And so Dr. Helgason testified to a list of things that he should have done. But I want to make one preliminary comment too, which is no one knows that he got there at 455. The nurse charted that he got there at 435 and was there continuously for the whole time. So there is conflicting evidence about all sorts of things. None of the three key people in this case tell the story the same way, and the fourth key person didn't survive to tell the tale. So we do have differences, but one thing that I think there's no doubt about is that, and I believe this was a conceded point even in the briefs, or at least it's silent about that. Our list of specific acts of negligence charged against Dr. Helgason were inadequately communicating with other members of the recovery room team. There was evidence on every point B, failing to take timely steps to investigate the possibility of internal bleeding. C, failing to timely request a surgical consultation. And D, failing to timely order preparation of the operating room for a return to surgery. We had expert evidence admitted without objection on every one of those issues. We had causal connection testimony on every one of those issues. We had contests associated with it that were debated out before the jury. The jury returned the verdict, and it is not the case that Judge Brady ever found any misconduct by me or anybody else on the trial team. It's not the case that he found any unfairness in this verdict. It's not the case that he found anything materially wrong that occurred. He ruled on balls and strikes, and we respected that to the best of our ability. The closing statement has been commented on here. If you read the entirety of the closing statement, you'll see that the theme behind this was decide the case based on the evidence and based on the law, and based not on outside factors. We talked about that. There is not a punish people, you will not find it. If you read that closing statement, you will not find it. But we still have this slide show. This is our second slide show of the day, and we've seen them in different situations. What's the purpose of this? This is your call to action, whether you say it or do it. We'll put it up in neon lights. So let me explain to you, that particular slide, one of many, most of which have not been called to your attention, because there is no objection to them, but that particular slide show had the concept of compensation with a scene of ladies of justice and an explanation that if they find fault, that it's their job to appropriately compensate the plaintiff within the bounds of the law. And the comment, that's your call to action, it's not being related to violations of safety rules or anything else. These are things they objected to in a different slide. The slide that talked about your call to action is your call to action is to decide fault and determine damages, because that was their call to action. I did not think that there was anything wrong with that, but the trial judge didn't agree, and that's fine. The thing, I never got the words out of my mouth, you will not find those there. And as soon as there's an objection, the thing is down, as Judge Brady made perfectly clear. And the business about were safety rules violated, we in fact believe that they were. But the trial court has great discretion here on many, many issues, and so I didn't think that should be shown, it's done. And then he had us go through the whole rest of the slide show right after this in real time. Everybody aired out what was what, and the rest of the closing finished. That is not a closing that is asking people to do anything inappropriate. And this business about Dr. Nassim being bad, we did not make any attempt to that. And I have to tell you, I'm not a stranger to trying medical malpractice cases. It would not be smart to do. You don't win medical malpractice cases by calling people bad, evil, liars, or anything else. What's the purpose of- Okay, so there were purposes. The purpose of the question, aren't there, I may not have the exact question. Aren't there more experienced doctors in the practice or something? You dealt with more experienced doctors in the practice. What is that? That means he isn't experienced. Well, the facts were that he was a very new anesthesiologist. There was very, the evidence was unclear where he was at different periods of time and conflicting. And we were not trying to undermine his credentials. He's a fully licensed anesthesiologist. But the fact that he was a young, brand new doctor is something that was probably most pertinent to the prosecution of Dr. Myfair, which was going on. You understand, we had the practical problem of trying three defendants, not one. We didn't succeed with respect to Dr. Myfair, and I have full respect for the jury's determination. We've filed no post-trial motions associated with that, and not sought any relief associated with that. His version was he was only there for a minute. But the fact that the nurse was highly experienced, the fact that the surgeon was, the fact that the anesthesiologist was a relatively new player, we did not see that as an irrelevant fact or something that would be inappropriately prejudicial to anybody about anything. As far as the possible arguments that against a verdict, that you filed a motion to eliminate seeking to have, to bar those from being raised, how would you address it? Let me make sure I caught that one first. Could you repeat that one? I didn't fully grasp it. Yeah, wasn't there a slide that addressed common arguments that people have against plain verdicts for the plaintiff? Which you had filed actually a motion to eliminate seeking to bar, and then you bring it up yourself. Yes, and I'm trapping now 100% what you're talking about. So we did file a motion to keep reference to improper factors, like you're going to make them multimillionaires. That kind of thing. We did file that motion. The slide that you're talking about is not arguing improper factors. The slide that we're talking about is explaining to the jury, it's really explaining this is what the law is, and this is what you're here to decide. And you're not here to decide the case based on outside factors, and the slide would have had some examples of inappropriate considerations. Do not consider that the same thing. Were those shown to the jury? Well, they were briefly. And again, I'd have to go back and look precisely. But we began, and then I believe, if my memory is right on this, there was an objection about that, and it was out. It's possible that this was during the time we went through all the slides later. I mean, at some point it was out. There was not a meaningful discussion about that because it was either cut off in the real time, or not done in front of the jury at all. But I suspect it was done in front of the jury a little, and then cut off. Would you mind just briefly addressing, this wasn't brought up in the argument preceding yours, but it is raised in the briefs, and the issue of a doctor testifying as to the standard of care for someone who is of a different specialty than himself. Okay, so the only instances that I am aware of where that occurs is where the issue is the communication standard of care, if you will. There's a case, I think, from this court of Wingo, and there are other cases from other courts in the state as well. But the general idea is when doctors and nurses, I think that would be the classic example of this could occur in other ways. When people are working together in a team fashion on a problem, they each are quite familiar with what it is that is expected by way of communications and information, because each is relying on the information by the other. And so our understanding of this is that it would be permissible, for example, for Dr. Bell, who's a surgeon, and I think that might be the specific example in this case, to comment about what sort of information a general surgeon would expect to be provided by either an anesthesiologist or a nurse in the PACU. So that- It would be one thing for a doctor to comment on the standard of care for a nurse. Is it appropriate for one doctor who is not of that same specialty to comment, to give an opinion as to the standard of care of another doctor in a different specialty? Communications, when they're participating on the same team, my answer is yes, and my authority is wingo. And other similar cases. A lot of those cases I know are nurse-doctor cases, as opposed to doctor-doctor. Yeah, and I get the question, and I'm not 100% sure. I imagine if we did some research, we could probably find the doctor-to-doctor aspect. But the principle behind it is when two, three, four, when several people are participating together in a healthcare endeavor, and communication between themselves is a natural part of the flow, the expected things to be communicated are important, particularly where they're relying on one another, etc. So I haven't perceived that, and I could be wrong, but I haven't perceived that as a highly controversial area of this law. But I do fully respect your point, because certainly it goes over the principle line, at least as I understand it, for a doctor to comment about a nurse's standard of what has to be done or not done. Similarly, between doctors in different specialties, although these two doctors are both medical doctors, so there's no question that they're in the same school from the, is it the Dolan case? Or somebody talking about schools, that Dr. Bell and Dr. Helgeson are in fact in the same school, but they're not in the same subspecialty. And so I think it's a very legitimate issue, but I don't think that it's a very hard one. So I probably am over my time, and I'd love to talk, and I'd be happy to defend a lot of questions. Yeah, right. Well, in summary, I think the bottom line here is I'd like to conclude by talking a little bit about the standards of review. Because the outstanding appellate counsel here knows these very well, but I don't see the clearest statement about those. So where are the questions of law in this versus where are the questions that deference is due to the trial judge? Because most of the issues before you are issues where it's trial court discretion. And this trial court worked very hard, even the points you were making, Justice Hutchinson, about how seriously Judge Brady would consider things. He did, and I don't think he made rulings on things until he was comfortable that he got it right. So he's not entitled to any more discretion than any other trial judge, but trial judges, of course, aren't entitled to great discretion. So where are the questions of law? Well, I think one of the questions of law is should race IPSA have been submitted, though I don't think you necessarily have to reach it because you have no idea what effect if any race IPSA had here. But there's potential question there, and if there is that question, I handed you the statute that answers the question because the evidence in the case lines up with the statute perfectly. And also lines up with the billing case, so I actually think that that question of law is an easy answer. And so is the other one, which is there is not enough evidence to prove causation in this case. That one doesn't pass the straight face test, and we've given plenty of pages with details about why that question of law also deserves an answer to the appellant of I'm sorry, because they're not wrong in either of those questions of law. Everything else here is a question that would require the defendant to prove an abuse of discretion. And with due respect to the defendant, with due respect to their counsel, who I admire greatly, they haven't come close. All right, thank you, Your Honors. Thank you, Your Honors. I'll be brief. I'd like to address a few specific questions that were raised during counsel's argument. It certainly was not my intention to abandon the issue of having unqualified testimony critical of Dr. Nassim, which we do raise in our brief, Your Honor, as you noted. And I can say also, and this was a point that we raised in our brief, that the Wingo case addressed exactly what the court's question was, which is the communication in the surgical context between doctor and nurse. And there's no case that I know of, and there certainly was no cases that were cited in the plaintiff's brief that supports the extension of that principle to a doctor criticizing another doctor. Well, there is, as I was reading through that section, I couldn't help but think of FBI, CIA. They're doing similar type work, but yet they refuse to communicate with each other, because they have their own territory, so to speak. Well, should the surgeon have stayed out of the PACU until such time as he was asked to come back in? I mean, what should they tell each other? Or what should Nurse Schweitzer have said? Well, Dr. Nassim has it under control. Well, okay, Dr. Mayford was just here. Oh, well, good, good, that's good. What's she supposed to say? Well, I see where the court's coming from. I think there's this sort of a combination of a couple of concepts. The concept that I was addressing was just as a competency question, can a physician, for example, Dr. Mayford, who's a surgeon, or Dr. Saker, who's a hematologist, give standard of care testimony that's critical of Dr. Nassim, who's an anesthesiologist? And the criticisms that were offered, it was Dr. Bell, I may have limited his, I'd have to check my brief, to this communication concept. But that's not true of Dr. Saker and Dr. Mayford, who gave essentially standard of care testimony critical of Dr. Nassim. That didn't have anything to do with communication. It was he should have ordered a CBC by X time. So I feel like that, you know, the communication testimony, standard of care testimony wasn't appropriate by somebody outside that area, and certainly these other criticisms weren't. And so to answer your question, Your Honor, then what we need is an anesthesiologist saying Dr. Nassim, you should have done this or that or the other with communication. But that doesn't excuse these physicians from other specialties giving that kind of testimony. Dr. Saker's testifying to the amount of blood loss and things, you know, related to that. You can lose up to 15% that it's certain, and then what was found at the end. If he is, and he was there to tell us the purpose of a CBC, or what could be identified if a CBC had been ordered, why can't he testify to those things? He can testify to causation type of concepts, but he can't testify that that should have been done by a specific time by the anesthesiologist. That's just not his area. Well, we're not going to get back into a surgery room, a surgical room, if we don't have some of those tests done, correct? And wasn't his testimony going to the fact that if these things aren't done on a timely basis, she's not going to get back into a room for surgery, and as it turned out, apparently they didn't even have a room for surgery that they had to get ready. Well, as far as Dr. Saker is concerned, I mean, I don't think that's not the purpose of his testimony is to give the hematology type of causation testimony, not testimony as to when or what Dr. Nassim should have done at a specific point in time. That, our position is different. But he said that she needed to get back into, based upon what he saw, she needed to get into the surgery room pretty quickly. Well, okay, I'm going to take issue with that, Your Honor, because Dr. Saker deferred to the surgeons as far as timing of surgery, so that really wasn't his testimony. Okay, but it had to be before she lost 30% of her blood. Well, if that's the case, then that was, you know, 35 minutes before anybody has said anything that Dr. Nassim has done anything wrong. She had lost 30% of her blood by the time of 4.55, Your Honor? By 4.15, Your Honor, by 4.15. And remember, just, you know, getting back to that timeline question that the court asked when I was first addressing the court was at the 4.55 point in time, Dr. Nassim is in the interventional radiology suite. He's back in at bedside at 5.09, and nobody has said that there's anything wrong with Dr. Nassim being a hallway away and doing that and then, you know, to the extent that there's any discussion about the communication. The other point that I think is important to know, well, I'm going to switch because I know that my time is quite limited, but I think it's important to note that these, this, I have to disagree with counsel's characterization about these slides. This business of the slide is up so I'm not arguing, unless the words are coming out of my mouth. It's not a communication to the jury. I think it's exactly the opposite. And the characterization of, okay, well, I told the jury that the jury should decide this case and calculate damages based on the law and the evidence. That doesn't excuse them coming forward and making statements that are completely inappropriate and tell the jury exactly the wrong information about what the jury should be thinking about. As far as this improper factors slide, which went up in front of the jury, the third point on there is a large verdict will drive a crisis. What does that implicate? Insurance. That's completely inappropriate. So we can't raise, you know, I certainly wouldn't want to have precedent saying that lawyers can raise issues at closing argument and say, you can't hear this, you can't consider this, and then bring in inappropriate comments. That's just not the case. And I also have to take issue, and I appreciate the court's indulgence, with the characterization as this, you know, perfectly innocent testimony and cross-examination of Dr. Nassim and Nurse Schweitzer about Dr. Nassim's qualifications. I mean, under this supposedly background questioning, that was the justification of trial, the questioning of Dr. Nassim is, so you're in the interventional, you know, you're with this patient who's getting a pacemaker, and, you know, you're supposed to be watching monitors, right? And do you ever talk to your family? Oh, well, no, not usually. And what else are you doing that distracts you? And then the repeated and repeated comments and questions and implications during Nurse Schweitzer's testimony about, you know the difference between an experienced doctor and somebody who doesn't have much experience, don't you? Didn't you feel uncomfortable? Didn't you wish somebody was there? And this was not one comment, objections sustained and we're done with it. This was repeated, and this was a theme. This wasn't a straight comment. And so I have to ask the court to look very carefully at that and consider whether there was a possibility of having a fair trial with this kind of information being provided to the jury, and I submit there was not. So I wish to thank the court for its time and ask the court to provide the relief that we sought in our briefs. Thank you. Thank you. All right, counsel, thank you so much for your arguments this afternoon. Thank you for your forbearance in letting us finish up the other matters. We hope we don't get too much traffic on the way back home. And we will make a decision in this matter in due course. At this point, we are standing adjourned for the day. Thank you.